(*Municipal Court of Chicago.*)

## Smith, et al.

### vs.

## Loyal Americans of the Republic.

(1907.)

1. CORPORATIONS—CONSOLIDATION—NATURE OF. Consolidation is to be distinguished in law from a succession or a purchase or a transfer of assets. The usual form of consolidation is for one corporation to issue its own stock to the shareholders of the other.

2. FRATERNAL INSURANCE COMPANIES—CONSOLIDATION—WHAT CONSTITUTES. Where the members of a fraternal organization are transferred to another similar organization and the latter issues new certificates of insurance to the former members of the other company, this is in effect a consolidation.

3. CONSOLIDATION OF CORPORATIONS. Corporations cannot be consolidated without express legislative sanction.

4. FRATERNAL BENEFIT SOCIETIES—RIGHT TO CONSOLIDATE. Under the laws of Illinois, fraternal benefit societies are not authorized to consolidate.

5. SAME—RIGHT TO PAY FOR OBTAINING NEW MEMBERS. Under section 8 of the Fraternal Benefit Association Act which provides that such societies shall not employ paid agents in soliciting or procuring members except in the organizing or building up of subordinate bodies, or granting members inducements to procure new members, it is contemplated that all such new members shall be secured by individual application and medical examination. It does not include the wholesale transfer of all the memberships in another organization.

6. SAME—CONTRACT WITH MEMBERS—WHAT CONSTITUTES. The contract between a member and his society consists in his application, examination by physician, constitution, by-laws, and certificate.

7. CORPORATIONS—ULTRA VIRES—ESTOPPEL. The doctrine that a corporation cannot avail itself of the defense of *ultra vires* when a contract has in good faith been performed by the other party and the corporation has had the full benefit of its performance does not apply where such contract is immoral or illegal or prohibited by statute, or where its enforcement would be against public policy.

On demurrer to amended fifth and sixth additional counts. No. 350. First class. Heard before Judge Foster. The facts are stated in the opinion.

Messrs. *Dandridge & Pugh,* attorneys for plaintiff.

*D. W. Dixon,* and *Tenney, Coffeen, Harding & Wilkerson,* attorneys for defendant.

FOSTER, J.:—

The two additional counts demurred to set out in substance that the defendant is a Fraternal Benefit Society, which was originally organized under the Act approved and in force June 22, 1893, under the name of Royal Circle, and that the defendant now acting under its new name is governed by that act and the acts amendatory thereto; that the Fraternal Army of Loyal Americans was another society of the same kind as defendant with "a rate paying membership of more than 22,500 members," and that the defendant employed the plaintiffs, who were members of defendant society, to procure and bring about * * * a so called consolidation and uniting of the membership of the Fraternal Army of Loyal Americans with the defendant, which said consolidation and uniting consisted and was to consist in the securing and transferring to the defendant of the said membership and the reinsurance of the said members of the Fraternal Army of Loyal Americans in the defendant society, and that plaintiffs did procure said so called consolidation or uniting * * * and did secure and cause to be transferred to the defendant about 22,500 members, more or less, and the insurance of said members by the defendant; that the acts of plaintiff resulted in the organizing and building up of a great number of subordinate lodges of and for the defendant, and secured new members "to the number of 22,500 as aforesaid."

The counts contain further allegations as to the benefits that accrued to defendant from plaintiff's acts, and one proceeds on the theory of *quantum meruit,* while the other alleges a special contract to pay plaintiffs the amount of $70,000 in consideration of these services.

While there is perhaps some ambiguity in the language em-

ployed, it sufficiently appears, and is, we understand, admitted by counsel that the substance of the transaction was a consolidation or uniting of the membership of the two fraternal benefit societies; as counsel for plaintiff states, ''The acts themselves being set out, it seems immaterial whether they are referred to as a 'consolidation,' 'amalgamation,' 'merger,' or 'benevolent assimilation.' ''

''Consolidation'' is to be distinguished in law from a succession or a purchase or transfer of assets; *Loughlin v. U. S. School Furniture Co.*, 118 Ill. App. 36; but here, where all the 22,500 members were transferred and reinsured by the defendant, it would seem that the word ''consolidation'' was correctly used by the plaintiffs in their declaration. As is said in 10 Cyc. p. 314, ''The    *    *    *    usual form (of consolidation) is for the purchasing company to issue its own shares to the shareholders of the selling company in payment or exchange therefor.'' To the same effect is the decision of our supreme court in *C. S. F. Ry. Co. v. Ashline*, 160 Ill. 373. This case emphasizes such issuance of stock as the distinguishing feature of a consolidation. Applying this principle to insurance companies, it is hard to see how ''consolidation'' could be more completely effected than in the case at bar, where the defendant company, it would appear (although the allegation is not specific), issued new certificates of insurance to the former members of the other company.

The main question, therefore, that arises on this demurrer is whether or not the defendant corporation and the Fraternal Army of Loyal Americans could be lawfully consolidated or merged.

As stated by our supreme court in *American Trust Co. v. Minn. & N. W. R. R. Co.*, 157 Ill. 641, ''Corporations cannot be consolidated without express sanction of the state    *    *    *    and if the power to consolidate with other railroads is withheld, it is regarded as a prohibition against the exercise of such a power; 3 Wood on Law of Railroads, sec. 486.'' This case is followed, and its doctrine applied to an attempted merger of a domestic with a foreign insurance company in *Kavanaugh v. Omaha Life Association*, 84 Fed. 295.

There is no general statute of the state of Illinois authorizing the consolidation of such corporations, and the question presented must be determined by an examination of the particular act under which these two companies were organized.

In *Lehman v. Clark,* 174 Ill. 279, Mr. Justice Phillips said: "It was held in *Bastian v. Modern Woodmen,* 166 Ill. 595, that the two acts approved June 22, 1893, were designed to create certain classes of corporations furnishing life insurance or indemnity under various former acts and to enact and create a complete code for each." In fact, the act in force July 1 contains an express provision in section 11 that it does not apply to fraternal benefit societies and the act in force June 22, 1893, expressly provides in section 1 that "all such (benefit) societies shall be governed by this act, and shall be exempt from the provisions of all insurance laws of this state, and no law hereafter passed shall apply to them unless they be expressly designated therein." (Hurd's revised statutes, chap. 73, sec. 258.) What construction, then, is to be put upon the fraternal benefit society act approved and in force June 22, 1893? Hurd's revised statutes, chap. 73, sec. 258, *et seq.,* p. 1222.

It is to be noted that the assessment company act approved on the same day, June 22, 1893, but in force July 1 (Hurd's revised statutes, chap. 73, sec. 230 *et seq.,* p. 1214, contains an express clause (sec. 16, Hurd's revised statutes, sec. 245, p. 1219) authorizing the transfer of all of the risks of a company organized under its provisions, but prescribes certain conditions that must first be complied with for the protection of the insured, to wit: That the contract of transfer or reinsurance must be approved by a vote of two-thirds of the insured at a meeting specially called for the purpose, and each member is given the right within ten days after the meeting to give notice that he prefers to be transferred to some other society.

These provisions, have of course, no application to the case at bar, but they indicate the policy of the state to protect the insurance certificate holders. See also *Boles v. Mutual Re-*

*serve Life Association*, 220 Ill. 400, and *Brown v. Mutual Reserve Life Association*, 224 Ill. 576. Indeed, all life insurance companies are peculiarly under the control of the state for the protection of their members. *Chicago Life Insurance Company v. Auditor*, 101 Ill. 82.

The very fact that the assessment company act passed by the legislature at the same session and approved on the same day contained the above power to consolidate, while the act herein in question contained no such power, is in itself evidence that the legislature did not wish to authorize, under any circumstances, a consolidation of fraternal benefit societies.

It is not altogether clear just how the "consolidation," "merger," "amalgamation," or "benevolent assimilation"—to use again the terms applied by plaintiffs—was brought about, but enough does, we think, appear from the declaration to show that the Fraternal Army of Loyal Americans went out of existence, for not only were its full 22,500 members transferred to the defendant, but, as appears by the sixth additional count, "all the assets of the Fraternal Army of Loyal Americans, amounting to approximately $40,000 in cash and securities," were received, used, and retained by the defendant. Enough, we think, is stated to show that the transfer of members to the defendant was in bulk, and not in the regular method of receiving separate applications and passing medical examinations. In fact, the declaration refers to the "ordinary and usual methods of securing premium paying members * * * by solicitation of individuals" as being quite different from the methods pursued here by which the plaintiffs "caused to be transferred to the defendant about 22,500 members." The plaintiffs cite in their brief three different cases, whereas their brief states the "reinsurance contract was similar to the one in controversy." In two of these cases—*Seymour v. Chicago Guaranty Fund Life Association*, 55 N. W. 907 (Minn.), and *Cotton v. South Western Mutual Life Ass'n*, 115 Iowa, 729, 87 N. W. 675—the consolidated or reinsuring company issued its own new policies

of insurance, but without new applications by the members and without new medical examinations, while in the third case—*Parvin v. Mutual Reserve Life Insurance Company*, 100 N. W. 39 (Iowa)—no new policies were issued. In all cases there was a contract by the company sued to assume all liabilities of the former society, and to take over all the members of the latter company and some such general contract between the Fraternal Army of Loyal Americans and the defendant must, it would seem, have been made here.

The plaintiffs' declaration proceeds on the theory that they can recover under section 8 of the fraternal benefit association act, which provides as follows: "Such societies shall not employ paid agents in soliciting or procuring members, except in the organizing or building up of subordinate bodies, or granting members inducements to procure new members."

We are of the opinion that the only method contemplated by this section of securing new members was by individual application and medical examination, "the plan of organization" requiring such preliminary steps as much in the case of later applicants as it does in case of original organization. *Fraternal Tribunes v. Steele*, 114 Ill. App. 194.

Plaintiffs therefore cannot claim that this "consolidation" and the "transferring of 22,500 members caused by them" was such a securing of new members or building up of new subordinate lodges as section 8 refers to. If we are right in this conclusion, then this section contains an express prohibition against such a claim as the plaintiffs now make for compensation.

The courts of at least three states have already condemned wholesale transfers of membership similar to the case at bar.

In *State v. Bankers' Union*, 99 N. W. 531 (Neb., 1904), the court says: "It is charged that the defendant has diverted the funds of the society and paid out large sums for the alleged purchase of the business and membership of other purchased organizations, and that the memberships of such other purchased organizations were admitted to the defendant association without medical examination, at lower and

less rates of charges and assessments than required from persons originally becoming members of the defendant society. * * * "Referee finds * * * of these evils the following are the most conspicuous. * * * There are of necessity members whose health has failed or who have passed the age of 55, between the date of the entry into the transferred order and its transfer to another order. These must either be ignored and their insurance thus destroyed without their consent, or a physical examination must be waived contrary to the provisions of the statutes of the state. Reserves accumulated must be diverted by the transferred society to an improper purpose, and thus there must be violated a sacred trust." * * *

"The statute prescribes the qualifications of members that may be admitted, and to admit members above the age limit or without medical examination is clearly in violation of its provisions. What may not be done directly in that regard cannot be done by taking over the entire membership of another society, and the conduct of the defendant was clearly a manifest violation of law."

It does not affirmatively appear that in the case at bar any of the transferred members were over the age of 60 years—the limit prescribed in the act—but if such consolidations are to be allowed there would of necessity be some cases in which such facts would arise.

Certificates issued by the consolidated company to any members above the age of 60 years would be absolutely void. *Steele v. Fraternal Tribunes*, 215 Ill. 190 (affirming 114 Appellate, 194.) And any such certificate holder in the former society which had been consolidated and gone out of existence would be left without adequate protection.

*Bankers' Union of the World v. Crawford*, 73 Pac. 79 (Kansas, July, 1903), In this case it appears that a contract was made Oct. 12, 1901, by which the general officers of the National Aid society, a fraternal insurance company, should do all they could to secure the transfer of the management of that association to the Bankers' Union and to procure

members of the former to become members of the Bankers'
Union, and said officers were to receive $500 if the consolida-
tion was completed, and the further sum of $10,000 which
was evidenced by notes; such consolidation was effected and
the Bankers' Union obtained an increase of 4,000 members.
Prior to this contract William H. Crawford died in good
standing in the National Aid; the plaintiff was his benefi-
ciary, but her claim had not been paid by the National Aid
and she sued the defendant under the above contract by
which defendant "assumed and agreed to pay all the just
and legal claims" of the National Aid society.  The court say
at page 81: "It is not sufficient to authorize a corporation
to act that no limitation is found in the law forbidding the
act.  The right to act must be conferred expressly or by nec-
essary implication, or it does not exist.  We have searched
the statute in vain to find adequate warrant therein for a
transaction such as is stated in plaintiff's petition.  It is
claimed that section 3575, Gen. St. 1901, relating to fraternal
beneficiary societies, which authorizes such societies to make
and enforce contracts in relation to their business, implies the
right to make the contract in question.  It is suggested that
the increase of members is the chief object of the existence of
these beneficiary associations; hence an agreement made to
promote that end would be one in relation to the business of
the corporation.

"While, of course, no corporation, much less one of this char-
acter, could exist without persons connected therewith, nei-
ther could one like this long exist without a constant accession
to its membership; it surely is a misuse of terms to say that
the obtaining of members is the business of the corporation.
Members enable it to pursue its business, but the obtaining
of members is not its business.  Its business is defined in the
statute to be the making of provision for the payment of
benefits in case of death, sickness, or temporary disability;
and this business must be carried on for the sole benefit of its
members and their beneficiaries.  For the purpose of carry-
ing on this business, such associations are authorized by the

statute to create a fund 'from which the expenses of such association shall be defrayed, which shall be derived from assessments, premiums, or dues from its members, and interest accumulations thereon.' Thus it appears clearly that these associations are to be administered for the sole benefit of their members and their beneficiaries, by means of assessments and dues collected from such members, that is, that only members may be called upon to contribute, and only they or their beneficiaries may receive indemnity. These associations are not permitted to go out and engage generally in the business of furnishing indemnity. Their distinct characteristics and charter life would be destroyed in so doing. The agreement counted upon in the case at bar contemplates the payment of money to one not a member of the Bankers' union from moneys not received from the association of which plaintiff is a beneficiary. Such a transaction is wholly outside of the letter and spirit of the charter act, and in excess of any power conferred upon the association. The making and procuring of it is therefore *ultra vires,* and not to be enforced. * * * It is, however, claimed by the defendant in error that, while it would not be permitted the Bankers' union to collect money from an assessment upon its members for the purpose of paying the death loss of one who had never been a member, yet it is competent for it to pay this death loss out of the expense fund which the association is authorized to accumulate; that the obtaining of members of any association costs approximately $10 apiece, and that by this arrangement a large number of members were added without expense, so that the payment of this claim, which is in fact a mortuary one, might be made out of the expense fund, in lieu of paying a canvasser or deputy for accomplishing the same result. We are not disposed to give this suggestion serious consideration. To permit that to be accomplished indirectly which could not be done directly is to encourage indirect and reprehensible means, rather than open and fair dealing. Besides this, we find no allegations in the petition on which to base this claim.''

The case of *Twiss v. Guaranty Life Association,* 55 N. W. 8 (Iowa), is to the same effect.

I have read the cases cited by plaintiffs to sustain their contention, but do not find that they call for extended comment. The case of *Parvin v. Mutual Reserve Life Insurance Company,* 100 N. W. 39 (Iowa), deals with the transfer of all members of an Illinois assessment company organized under the act that went into effect July 1, 1893. The only question before the court was as to whether the power to transfer or consolidate expressly given by that statute had been followed. The court, in its opinion, gave expression to some general propositions which do not, as we understand it, correctly represent the law of Illinois.

A careful reading of the fraternal benefit society act in our state makes it sufficiently plain, we think, that no such "consolidation" was ever contemplated or authorized by the legislature. These are unique corporations organized for "the sole benefit of its members and their beneficiaries and not for profit." It is repeatedly declared that they must maintain a lodge system with ritualistic form of work and representative form ·of government. As above stated, no paid agents are to be employed except in certain specified cases. The members of any religious denomination may incorporate under the act, and members in such corporation shall be confined to the members of such religious denomination.

· Commercial travelers are also allowed to incorporate under the provisions of this act, but members of such incorporations are limited to those actually engaged as travelers or those who employ them.

The contract between a member and his society consists in his application, examination by physician, constitution, by-laws, and certificate. *Fullenwider v. Royal League,* 180 Ill. 625.

Suppose that a Methodist denomination association was organized under the act and then a "consolidation" or "merger" such as in the case at bar was brought about with some

Baptist denomination society similarly organized, or suppose a commercial travelers' association was so "consolidated" or "merged" with an association having miscellaneous members. Would not the contract as above defined between the Methodist society and its members in the first instance, and the contract between the commercial travelers' association and its members in the second instance, have been wholly violated? But it will be said such facts do not arise here.    That is true, but these provisions and the possibility that such facts might appear in other cases, if mergers were allowed, show that the legislature never intended that they should take place.

Finally it is alleged by plaintiff that the defendant has received the benefits of the plaintiff's labor, and it is urged that the defendant is estopped to set up the defense of *ultra vires*. This contention is met by the following decision:

In *Fritze v. Equitable B. & L. Society*, 186 Ill. 183, the court says at 199: "The doctrine, however, that a corporation cannot avail itself of the defense of *ultra vires* when a contract has been in good faith performed by the other party and the corporation has had the full benefit of its performance was never held to have any application where such contract is immoral or illegal or prohibited by statute, or where its enforcement would be against public policy." The contract there was prohibited by the statute, not expressly, but by implication from omission as in the case at bar, and its enforcement was held to be against public policy.

In *Steele v. Fraternal Tribunes*, 215 Ill. 190, Mr. Justice Wilkin said: "It is insisted, however, that even though the contract be regarded as *ultra vires*, yet defendant in error cannot avail itself of such defense, the contract having been performed in good faith by the other party, and the corporation had the full benefit of such performance.    We cannot agree with this contention.    A contract of a corporation which is *ultra vires* in the proper sense of that term—that is to say outside the object of its creation, as defined by the laws of its organization and therefore beyond the powers conferred upon it by the legislature, is not only voidable, but wholly void and

of no effect. The objection to the contract here is not merely that the corporation ought not to have made it, but that it could not lawfully make it. The contract could not be ratified by either party because it could not have been authorized by either. No performance by the parties could give the unlawful contract validity or become the foundation of any right of action upon it. * * *

"A party dealing with a corporation having limited and delegated powers is chargeable with notice of those powers, and cannot plead his ignorance of their existence."

This case represents the law of this state as we understand it. A violation of a charter provision cannot be waived and no estoppel can be invoked. Such acts as are found in the Steele case and in the case at bar are to be distinguished from mere violations of by-laws adopted by the society which can be waived. (*Wood v. Supreme Ruling of the Fraternal Mystic Circle,* 212 Ill. 532.)

Surely if a certificate holder who has in good faith paid all his assessments cannot recover when his acceptance by the society was beyond its charter powers the plaintiffs here cannot be allowed to claim that the principle of estoppel forbids the defendant from pleading *ultra vires.*

The general demurrer to the first and sixth additional counts is therefore sustained.